## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Metropolitan Property and Casualty
Insurance Company,

                                  Civil No. 14-2848 (DWF/SER)

            Plaintiff,

v.

                                    **MEMORANDUM**
                            **OPINION AND ORDER**

Barbara Marti; Shawn Patrick Hearn;
Morgan Creek Vineyards; and
West Bend Mutual Insurance Company, a
Wisconsin Corporation,

            Defendants.

West Bend Mutual Insurance Company,

            Counter-Claimant,

v.

Metropolitan Property and Casualty
Insurance Company,

            Counter-Defendant,

West Bend Mutual Insurance Company,

            Cross-Claimant,

v.

Shawn Hearn,

            Cross-Defendant.

---

Elizabeth M. Sorenson Brotten, Esq., and Timothy J. O'Connor, Esq., Lind Jensen
Sullivan & Peterson, PA, counsel for Plaintiff.
John W. Carey, Esq., Shannon C. Carey, Esq., and Marcia K. Miller, Esq., SiebenCarey,
P.A., counsel for Defendant Barbara Marti.

Aaron S. Eken, Esq., and Paul F. McEllistrem, Esq., McEllistrem, Fargione, Landy,
Rorvig & Eken, P.A., counsel for Defendant Shawn Hearn.

Michael J. Will, Esq., Richard C. Scattergood, Esq., and Stacey L. Sever, Esq., Stich,
Angell, Kreidler, Dodge & Unke, P.A., counsel for Defendant Morgan Creek Vineyards.

Kerri J. Nelson, Esq., Mark D. Covin, Esq., and Shanda K. Pearson, Esq., Bassford
Remele, PA, counsel for Defendant West Bend Mutual Insurance Company.

---

## INTRODUCTION

This matter is before the Court on the Summary Judgment Motions of Defendant

Barbara Marti[1] ("B. Marti") (Doc. No. 35), Plaintiff Metropolitan Property and Casualty

Insurance Company ("Metropolitan") (Doc. No. 44), and Defendant West Bend Mutual

Insurance Company ("West Bend") (Doc. No. 50).  Defendant Shawn Hearn ("Hearn")

and Defendant Morgan Creek Vineyards ("Morgan Creek") have joined in these motions

in part, as described below.  (Doc. Nos. 54-55 & 62-64.)  For the reasons stated below,

the Court denies B. Marti's motion and grants in part and denies in part Metropolitan's

motion and West Bend's motion.

---

[1]　According to Barbara Marti's brief, Barbara Marti has changed her name to
Barbara Stirling since the accident giving rise to the underlying lawsuit.  (Doc. No. 36
at 2.)  To maintain consistency with the case caption in this matter, the Court will refer to
Barbara Stirling as Barbara Marti throughout this Order.

## BACKGROUND

In this declaratory judgment action, all parties request that the Court declare the responsibility of each insurer to cover B. Marti's claimed damages caused by injuries sustained when she fell from a John Deere Gator utility vehicle ("Gator") on Morgan Creek's premises.  The Gator is a six-wheeled 6x4 utility vehicle with a driver's seat, a passenger seat, and a large cargo box behind the seats.  (Doc. No. 38 ("Miller Aff.") ¶ 3, Ex. A ("Hearn Dep.") at 20 & Ex. 1; Miller Aff. ¶ 5, Ex. C ("P. Marti Dep.") at 15, 18, 21, 40-42, Exs. 2-5.)  The Gator was owned by Morgan Creek (P. Marti Dep. at 11, 44) and operated by Hearn at the time of the accident (Miller Aff. ¶ 4, Ex. B ("A. Marti Dep.") at 9-10).  Morgan Creek was covered under an insurance policy issued by West Bend (Doc. No. 53 ("Nelson Decl.") ¶ 3, Ex. B), and Hearn was covered under an insurance policy issued by Metropolitan (Nelson Decl. ¶ 4, Ex. C).

## I.     The Accident

On September 22, 2012, George Adam Marti ("A. Marti") invited several friends to Morgan Creek for a social gathering.  (Hearn Dep. at 7-9.)  Morgan Creek is owned by A. Marti's parents, Paula and George Marti ("P. and G. Marti"), and A. Marti is Morgan Creek's salesperson.  (*Id.* at 8; A. Marti Dep. at 5; P. Marti Dep. at 37.)  One of the individuals A. Marti invited to the winery was his friend, Hearn.  (Hearn Dep. at 8-9.)  Hearn is a sales representative for Johnson Brothers, an alcohol distributor.  (*Id.* at 8.)  However, Hearn was not an employee of Morgan Creek (*id.* at 35-36; Nelson Decl. ¶ 16, Ex. O at 2), and Hearn does not sell Morgan Creek products in his position at Johnson Brothers (Hearn Dep. at 8).  Hearn described the September 22, 2012 event as "[j]ust a

3

social gathering among friends." (*Id.* at 12.)  He explained, "We barbecue, play games, and sample wines from our personal collection." (*Id.*)

During the social gathering, A. Marti used the winery's John Deere Gator utility vehicle to transport food and wine to the winery's barbecue pit. (*Id.* at 17.)  The Gator was also used by two of the guests to drive around the vineyard at some point during the event. (Nelson Decl. ¶ 9, Ex. H ("2014 A. Marti Dep") at 27-28.)  The group also went on informal self-guided tours of the winery, either walking or riding on the Gator utility vehicle. (Hearn Dep. at 19-20.)  On the day of the accident, A. Marti and Hearn were planning to use the Gator to get firewood, but the trip turned into an informal tour of the winery with a group of several friends. (Nelson Decl. ¶ 10, Ex. I ("2014 Hearn Dep.") at 21-23.)  Hearn was operating the Gator while A. Marti rode in the passenger seat. (Hearn Dep. at 40; A. Marti Dep. at 18.)  B. Marti—A. Marti's spouse at the time of the accident—was riding in the back of the Gator, seated on the tailgate. (A. Marti Dep. at 8-9; Compl. ¶ 20, Ex. 3 ("Underlying Compl.") ¶ 7; Nelson Decl. ¶ 11, Ex. J ("B. Marti Dep.") at 43.)  While Hearn was backing up the Gator, B. Marti fell out of the Gator and was purportedly run over. (Underlying Compl. ¶ 8; 2014 A. Marti Dep. at 37-40; B. Marti Dep. at 45.)  B. Marti claims to have sustained severe injuries in this accident. (Underlying Compl. ¶ 11.)

## II.   The Insurance Policies

At the time of the accident, Hearn was insured under a homeowners insurance policy issued by Metropolitan ("Metropolitan Policy"). (Nelson Decl. ¶ 4, Ex. C; Hearn Dep. at 21.)  Morgan Creek was insured under a commercial general liability policy

issued by West Bend ("West Bend Policy").  (Nelson Decl. ¶ 3, Ex. B; P. Marti Dep.

at 31.)

### A.    The Metropolitan Policy

The Metropolitan Policy, policy number 8285834040, provided Hearn with

homeowners insurance coverage effective from May 5, 2012 to May 5, 2013.  (Nelson

Decl. ¶ 4, Ex. C at 3.)  The Metropolitan Policy contains the following exclusion for

losses relating to motorized land vehicles:

> 8.  Motorized Land Vehicles.  We do not cover bodily injury or property
> damage arising out of:
>> A.  the ownership, maintenance, occupancy, operation, use, loading
>> or unloading of a motorized land vehicle . . . owned or operated by
>> or rented or loaned to you . . . .

(*Id.* at 32.)  Under this exclusion, there are exceptions for certain categories of motorized

land vehicle usage.  Specifically, the Metropolitan Policy provides:

> Coverage is extended for bodily injury and property damage arising out of:
> . . .
> e.  a motorized land vehicle, not owned by you, principally designed for
> recreational use off public roads, and not subject to motor vehicle
> registration . . . .

(*Id.*)

### B.    The West Bend Policy

The West Bend Policy, policy number CPN 1745847 00, provided Morgan Creek

with coverage effective from April 30, 2012 to April 30, 2013.  (Nelson Decl. ¶ 3, Ex. B.

at WB000002.)  The West Bend Policy provides the following provision granting

coverage for bodily injury:

1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally
      obligated to pay as damages because of "bodily injury" or
      "property damage" to which this insurance applies. . . .

(*Id.* at WB000019.)  Under the section designating "who is an insured," the policy

provides the following:

1. If you are designated in the Declarations as:
   . . .
   b. A partnership[2] or joint venture, you are an insured.  Your
      members, your partners, and their spouses are also insureds, but
      only with respect to the conduct of your business.
   . . .
2. Each of the following is also an insured:
   a. Your "volunteer workers" only while performing duties related
      to the conduct of your business, or your "employees," . . . but
      only for acts within the scope of their employment by you or
      while performing duties related to the conduct of your business.
      . . .

(*Id.* at WB00027.)

## III.   The Gator

As noted above, the Gator is a six-wheeled 6x4 utility vehicle with a driver's seat,

a passenger seat, and a large cargo box behind the seats.  (Hearn Dep. at 20 & Ex. 1;

P. Marti Dep. at 15, 18, 21, 40-42, Exs. 2- 5.)  On the front of the Gator, a large warning

label states:  "WARNING RIDERS CAN FALL OFF AND BE KILLED."  (P. Marti

Dep., Ex. 2 at 2.)  The warning also states "Maximum of one person to a seat" and "No

riders in box or anywhere else."  (*Id.*)  These warnings are accompanied by visual

depictions of these prohibitions and a picture of an individual falling off the back of the

---

[2]     The West Bend Policy indicates that Morgan Creek is designated a partnership.
(Nelson Decl. ¶ 3, Ex. B. at WB000009.)

Gator.  (*Id.*)  A separate warning label on the Gator states:  "WARNING ROLLOVER

OR FALLING OFF MAY CAUSE DEATH."  (*Id.* at 4.)

The relevant John Deere Gator Utility Vehicle Operator's Manual[3] describes the

Gator as a "utility vehicle" numerous times.  (Doc. No. 46 ("Brotten Aff.") ¶ 9, Ex. 7

("Gator Operator's Manual") at 3-7.)  The manual contains the following statements

regarding the intended use of the vehicle:

> Do not misuse the utility vehicle.  It is a utility vehicle, not a recreation
> vehicle.
> . . .
> Horseplay or recreational riding can lead to accidents, severe bodily injury
> or death.
> . . .
> Misuse and recreational riding can lead to accidents, severe bodily injury or
> death.
> . . .
> DO NOT misuse the utility vehicle.  The utility vehicle is not designed for
> recreational riding.
> . . .
> Wear close fitting clothing and safety equipment appropriate for the job.

(*Id.* at 3-5, 8.)

P. Marti testified that the Gator was purchased for "ag work and hauling

equipment and hauling things" for "farming or agricultural" purposes.  (P. Marti Dep.

at 16-17, 20.)  The Gator was purchased from a Midwest Machinery sales representative

who had previously sold a tractor, a loader, an auger, and a lawn mower to the vineyard.

---

[3]      P. Marti could not locate the original manual provided to the winery for Morgan
Creek's Gator, despite searching for it.  (P. Marti Dep. at 19, 29.)  Counsel for
Metropolitan obtained the Operator's Manual submitted in conjunction with
Metropolitan's Motion for Summary Judgment directly from John Deere and asserts it is
applicable to Morgan Creek's Gator.  (Doc. No. 77 at 6; *see also* Doc. No. 46 ("Brotten
Aff.") ¶ 9.)

(*Id.* at 16-17 & Ex. 3.)  The purchase agreement for the Gator specifies the purchase type

as "FARM" and the end use code as "ROWCROP / SMALL GRAIN."  (*Id.* at 17-20 &

Ex. 3.)  It also specifies that the Gator is a "UTILITY VEHICLE."  (*Id.*)  P. Marti

testified that the Gator was used for "loading, loading cuttings, refuse, brush, [and]

hauling wood."  (*Id.* at 23.)  She agreed with the characterization of the vehicle as a

utility vehicle and agreed that the Gator owned by Morgan Creek was not a recreational

vehicle.  (*Id.* at 25, 27.)  She explained that the Gator was never used on public roads

because "all our activities are on the farm," and she agreed that the Gator was driven

entirely within the Morgan Creek property.  (*Id.* at 26-27.)  P. Marti also testified that she

was not aware of anyone ever having used the Gator for a recreational purpose such as

"just tak[ing] it out in the woods for fun."  (*Id.* at 39.)

A. Marti agreed "that the Gator's purpose was to assist in the operation of Morgan

Creek Vineyards."  (A. Marti Dep. at 19.)  He also testified that the Gator at Morgan

Creek was a utility vehicle and not a recreational vehicle.  (*Id.*)  Specifically, he testified

that he had never used the Gator for what he would consider a recreational purpose.  (*Id.*

at 24.)

Hearn testified that he had operated Gator utility vehicles prior to the

September 22, 2012 incident hundreds of times.  (Hearn Dep. at 21.)  He explained that

he had done so to help friends who live on farms in their farming operations or for

transportation while hunting.  (*Id.* at 22-23.)  Hearn testified that he believed the purpose

of a Gator is for utility.  (*Id.* at 23.)

Promotional literature from the 2015 John Deere Traditional Utility Vehicles Work Series line of vehicles depicts Gators similar to the 2001 Gator involved in the underlying accident.  (Hearn Dep. at 23-25 & Ex. 2; P. Marti Dep. at 20, 25-26.)  This literature describes the Gator in the following terms:

> When it comes to work, Gator™ Utility Vehicles get serious.
>
> A load capacity to make a pickup truck envious, muscle to rip through rocks and mud, and backbone to get the job done whether in a barb-wired pasture or a construction site.
>
> In short, you'll find our utility models are worksite-ready and anything-you-can-throw-at-them ready.  They have engines that start when you do, cargo boxes that are easy to load and a never-call-in-sick attitude, just like yours.

(Hearn Dep., Ex. 2 at 2.)  Every depiction of the Gator models in this literature shows Gators being used for work or utility purposes such as construction, lawn maintenance, or transporting cargo.  (Hearn Dep., Ex. 2.)  In the portion of the promotional literature depicting the same type of Gator as Morgan Creek's—the Gator TH 6x4 model—the Gator is depicted along with two men wearing hard hats and reflective construction vests.  (*Id.* at 6.)  The literature explains, "In short, when it comes to work, [Gator TH 6x4 models] bring it."  (*Id.*)  P. Marti testified that the Gator TH 6x4 depicted in this promotional literature had "some similarities" to the Morgan Creek Gator despite being "[v]ery souped up."  (P. Marti Dep. at 25-26.)

John Deere's website identifies four categories of Gator Utility Vehicles—High-Performance, Crossover, Traditional, and Military.  (Doc. No. 69 ("Brotten Aff. II") ¶ 3, Ex. 1; Doc. No. 72 ("Nelson Decl. II") ¶ 3, Ex. T.)  The TH 6x4 model is in the

9

Traditional Utility Vehicles category, and the website describes this model as "[a] true workhorse." (Brotten Aff. II ¶ 4, Ex. 2.) Gator Traditional Utility Vehicles are described as "Hardworking, Reliable Utility Vehicles," and John Deere's website states "there's one for your farm, home or jobsite." (*Id.*) In contrast, Gator Crossover Utility Vehicles are "designed with extreme off-road performance and the ultimate in work capability," and the website explains they are both "[i]deal for the sportsman who hunts, fishes, or trail rides" and "a workhorse for anyone who cares for land and property." (Brotten Aff. II. ¶ 5, Ex. 3.)

## IV.   Procedural History

On August 19, 2013, B. Marti filed a lawsuit against Hearn and Morgan Creek in Blue Earth County, Minnesota ("the underlying lawsuit"). (Compl. ¶ 20; Underlying Compl.) B. Marti alleges Hearn is liable for the negligent and careless operation of the Gator and Morgan Creek is vicariously liable for Hearn's negligence as the owner of the Gator. (Underlying Compl. at ¶¶ 9-10.) B. Marti claims as damages lost wages, loss in earning capacity, and the cost of her medical treatment. (*Id.* at ¶ 11.)

On July 8, 2014, Metropolitan commenced this declaratory judgment action against B. Marti, Hearn, Morgan Creek, and West Bend to determine the scope and priority of coverage under the Metropolitan Policy for B. Marti's claims arising from the accident. (Compl.) In the Complaint, Metropolitan requests the following declaratory relief: (1) a declaration that the Metropolitan Policy issued to Hearn provides no coverage for any claims asserted by B. Marti against Hearn arising out of the September 22, 2012 accident; (2) a declaration that Metropolitan owes no duty to defend

or indemnify Hearn, or to pay any amounts to B. Marti, in connection with the underlying lawsuit; (3) a declaration that in the event the Court declares the Metropolitan Policy and the West Bend Policy both provide coverage for the claims alleged against Hearn in the underlying lawsuit, the West Bend policy provides primary coverage and the Metropolitan Policy provides excess coverage, if applicable.  (*Id.* at 9.)

On August 5, 2014, B. Marti filed an Answer to Metropolitan's Complaint.  (Doc. No. 6.)  In this Answer, B. Marti requests the following declaratory relief:  (1) a declaration that Hearn's insurance policy issued by Metropolitan was in effect and provides coverage for Hearn's activities at Morgan Creek on September 22, 2012, resulting in injuries to B. Marti; and (2) a declaration determining the priority of insurance coverage between West Bend and Metropolitan available to B. Marti for the injuries she sustained on September 22, 2012.  (*Id.* at 3.)  On September 11, 2014, Hearn filed an Answer to Metropolitan's Complaint, seeking the same declaratory relief as B. Marti and requesting that the Court remand the proceeding to the state district court overseeing the underlying lawsuit.  (Doc. No. 13 at 5-6.)

On September 25, 2014, West Bend filed an Amended Answer to Metropolitan's Complaint and a Counterclaim and Cross-Claim against Hearn and Metropolitan.  (Doc. No. 16.)  In its Counterclaim and Cross-Claim, West Bend requests the following declaratory relief:  (1) a declaration that coverage for the underlying lawsuit with respect to the negligence allegations against Hearn is barred by the terms and provisions of the West Bend Policy because Hearn is not an "insured" under the West Bend Policy; (2) a declaration that the Metropolitan Policy provides coverage for the underlying lawsuit

with respect to the negligence allegations against Hearn; and (3) as an alternative form of relief, a declaration that the Metropolitan Policy has priority over the West Bend Policy with respect to claims in the underlying lawsuit arising from Hearn's negligence. (*Id.* at 10-11.)

On September 26, 2014, Hearn filed an Answer to West Bend's Cross-Claim, requesting the following declaratory relief: (1) a declaration that Morgan Creek's insurance policy issued by West Bend was in effect and provides coverage for Hearn's activities at Morgan Creek on September 22, 2012; and (2) a declaration determining the priority of insurance coverage between West Bend and Metropolitan available to B. Marti for the injuries she sustained on September 22, 2012. (Doc. No. 17 at 3.)

On October 6, 2014, Metropolitan filed an Answer to West Bend's Counterclaim, requesting that West Bend's counterclaims be dismissed with prejudice and seeking the same declarations originally sought in Metropolitan's Complaint. (Doc. No. 19 at 5.)

B. Marti, Metropolitan, and West Bend now move for summary judgment.[4] (Doc. Nos. 35, 44, 50.) B. Marti seeks a declaration that Metropolitan has an obligation to provide coverage to Hearn.[5] (Doc. No. 36 at 15.) Each insurer seeks a declaration that it

---

[4]     Hearn and Morgan Creek join in B. Marti's Memorandum in Support of Summary Judgment (Doc. Nos. 54 & 55) and B. Marti's Memorandum in Response to the Summary Judgment Motions of Metropolitan Property and West Bend (Doc. Nos. 62 & 63). Morgan Creek also partially joins West Bend's Memorandum in Support of Summary Judgment, to the extent that West Bend argues that the Metropolitan Policy provides coverage. (Doc. No. 64.)

[5]     B. Marti originally appeared to request a declaration that West Bend is obligated to provide coverage for any liability attributed to Morgan Creek in the underlying

(Footnote Continued on Next Page)

has no obligation to provide coverage to Hearn in the underlying lawsuit and that the other insurer does have such an obligation.  (Doc. No. 45 at 26; Doc. No. 52 at 3.)  In the alternative, Metropolitan seeks a declaration that the West Bend Policy provides priority coverage if the Court determines both insurers have a coverage obligation with respect to the underlying lawsuit.  (Doc. No. 45 at 26.)

## DISCUSSION

### I.      Standard of Review

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna*

---

(Footnote Continued From Previous Page)

lawsuit.  (Doc. No. 36 at 15.)  B. Marti has since admitted that West Bend's obligation to provide coverage for Morgan Creek (as opposed to Hearn) is not in dispute.  (Doc. No. 73 at 2.)  Thus, she agrees that any portion of her motion addressing this issue should be denied as moot.  (*Id.*)

*Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate

the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

      The interpretation of an insurance policy is a matter of state law, and the parties do

not dispute that Minnesota law applies in this diversity action.  *See Progressive N. Ins.*

*Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) ("Minnesota law applies, as

Minnesota is the forum state and neither party has raised a choice-of-law claim.").  Under

Minnesota law, "[i]nterpretation of an insurance policy is a question of law."  *Travelers*

*Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006).  "If

the language of an insurance contract is unambiguous, it must be given its plain and

ordinary meaning.  But if the language is ambiguous, it will be construed against the

insurer, as drafter of the contract."  *Id.* (citation omitted).  Language in an insurance

policy should only be deemed ambiguous when "it is susceptible to two or more

reasonable interpretations," *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628,

636 (Minn. 2013), and courts should decline to find ambiguity where it does not exist,

*see Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc, Inc.*, 825 N.W.2d 695, 706 (Minn.

2013).  Policy language must "be interpreted according to both plain, ordinary sense and

what a reasonable person in the position of the insured would have understood the words

to mean."  *Wolters*, 831 N.W.2d at 636 (quotation marks omitted).

"While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Id.* However, once an exclusion is established, "the burden of proof shifts back to the insured because the exception to the exclusion restores coverage for which the insured bears the burden of proof." *Id.* (quotation marks omitted).

## II.     Coverage Under the Metropolitan Policy

Hearn's homeowners insurance policy—the Metropolitan Policy—excludes coverage for injuries arising out of "the ownership, maintenance, occupancy, operation, use, loading or unloading of a motorized land vehicle . . . owned or operated by or rented or loaned to you . . . ." (Nelson Decl. ¶ 4, Ex. C. at 32.)  However, coverage is extended for injuries that arise out of "a motorized land vehicle, not owned by you, principally designed for recreational use off public roads, and not subject to motor vehicle registration . . . ." (*Id.*)

### A.     Motorized Land Vehicle Exclusion

The parties do not dispute that the motorized land vehicle exclusion applies to Hearn's use of the Gator in this case.  The undisputed facts in the record establish that Hearn was operating the Gator—a motorized land vehicle—when B. Marti sustained the injuries giving rise to the claimed damages.  The plain language of the Metropolitan Policy's motorized land vehicle exclusion thus applies to exclude coverage.

### B.     Recreational Use Exception

The parties do, however, dispute the applicability of the recreational use exception to the motorized land vehicle exclusion.  This exception applies to extend coverage for

bodily injuries arising out of:  (1) a motorized land vehicle, (2) not owned by Hearn,

(3) principally designed for recreational use off public roads, (4) not subject to motor

vehicle registration.  The undisputed facts establish that elements (1) and (2) are met, and

the parties only dispute elements (3) and (4) of this exception.  B. Marti and West Bend

both argue that coverage is extended because the Gator was "principally designed for

recreational use off public roads" and "not subject to motor vehicle registration."

Metropolitan, on the other hand, contends that the Gator was *not* "principally designed

for recreational use" and *was* "subject to motor vehicle registration."  Both elements must

be established for the exception to apply, and it is the insured's burden to establish the

applicability of this exception.  *See Wolters*, 831 N.W.2d at 636.

### 1. "Principally Designed for Recreational Use Off Public Roads"

B. Marti acknowledges that "the Gator is an off-road utility vehicle" based on

photographs and John Deere promotional literature.  (Doc. No. 36 at 10.)  However,

B. Marti relies on Minnesota statutory definitions of "all-terrain vehicle," "utility

vehicle," "off-road recreational vehicle," and "recreational motor vehicle" to support her

position that under the plain meaning of the Metropolitan Policy, the Gator falls within

the recreational vehicle exception to the motor vehicle exclusion.  She also suggests that

the actual use of the Gator on the day of the accident was for both utility and recreational

purposes.  B. Marti emphasizes that the Metropolitan Policy does not define the phrase

"designed for recreational use off public roads" and argues that any ambiguity in the

policy should be construed in favor of coverage.  She further argues that if extrinsic

evidence is necessary to resolve the coverage question and that evidence is not

conclusive, summary judgment should be denied because the question should be presented to a jury.

West Bend argues that although the Gator was purchased and used for vineyard operations, it was designed for many purposes, including recreational uses such as hunting.  To support this argument, West Bend points to non-John Deere websites that illustrate various hunting attachments available for some Gator models.  (*See* Nelson Decl. Exs. ¶¶ 17-18, P & Q.)  West Bend also relies on case law from other jurisdictions in which courts discuss similar vehicles which are used for recreational purposes. Similarly, West Bend cites to case law from various jurisdictions to argue that all-terrain vehicles such as the Gator are designed to serve recreational purposes.  In addition, West Bend argues that the Gator's use at the time of the accident was recreational and the vehicle falls under the statutory definition of an "all-terrain vehicle," thus bringing the vehicle within the statutory definition of "recreational motor vehicle" in Minn. Stat. § 84.90, subd. 1(a).  Relying on dictionary definitions of the word "utility," West Bend contends that John Deere's use of this term to describe the Gator does not rule out recreational uses such as hunting.  West Bend also notes that the John Deere website refers to all Gators as utility vehicles even when they are depicted as engaged in recreational activities.  Finally, West Bend argues that the phrase "principally designed for recreational use" is ambiguous, so the Court must construe the policy in favor of coverage.

Metropolitan rejects the other parties' claims that the recreational use exception is ambiguous.  Metropolitan argues that the recreational use exception to the motor vehicle

exclusion does not apply because the Gator is not a recreational vehicle and was principally designed as a utility vehicle.  Specifically, Metropolitan relies on John Deere's Gator promotional materials, the purchase agreement for Morgan Creek's Gator, the Gator Operator's Manual, and testimony indicating how the Gator was actually used by Morgan Creek to support this argument.  Metropolitan also cites Minn. Stat. § 84.90, subd. 1, and argues that the Gator does not fall under this statutory definition of "recreational motor vehicle" because the Gator was neither designed nor used for recreational purposes.  Metropolitan notes that although some Gator models are designed for recreational use, Morgan Creek's Gator was not because it was part of the T-Series "Traditional Utility Vehicles" category of Gators.  In addition, Metropolitan emphasizes that the actual use of the vehicle at the time of the accident is not relevant for determining the use for which the vehicle was "principally designed."  Focusing on the ordinary meaning of the word "designed," Metropolitan argues that the Gator in question was not designed for recreational uses.  Finally, Metropolitan argues that it is the other parties' burden to demonstrate that the exception to the exclusion applies to restore coverage under the Metropolitan Policy and suggests that these parties have not met this burden.

The Court concludes that Morgan Creek's Gator was not "principally designed for recreational use."  Thus, element (3) of the recreational use clause extending coverage under the motorized vehicle exclusion is not established.  The Court reaches this conclusion for three primary reasons.

First, the Court concludes that the phrase "principally designed for recreational use off public roads" is unambiguous.  In *Christie v. Illinois Farmers Insurance Co.*, 580

N.W.2d 507 (Minn. Ct. App. 1998), the Minnesota Court of Appeals interpreted a similar

phrase in an insurance policy—"any other motorized land vehicle designed for

recreational use off public roads." *Id.* at 508.  Rejecting the invitation to find ambiguity

over whether the phrase applied to snowmobiles driven on snow or ice rather than "land,"

the court concluded the phrase was not ambiguous. *Id.* at 508-09.  Similarly, in this case,

the Court rejects the invitation to find ambiguity.  The phrase "principally designed for

recreational use off public roads" is not subject to more than one reasonable

interpretation. *See Wolters*, 831 N.W.2d at 636.  Thus, despite the fact that the phrase is

undefined within the Metropolitan Policy, there is no basis for the Court to conclude that

the recreational use exception is ambiguous, and the Court need not construe the

language in favor of coverage.

Second, the phrases "principally designed" and "recreational use" have ordinary

meanings that preclude applying the recreational use exception to the Gator.  In *Stepec v.

Farmers Insurance Co.*, 222 N.W.2d 796, 798 (Minn. 1974), the Minnesota Supreme

Court sought to determine whether a motor vehicle safety statute covered snowmobiles.

Specifically, the court analyzed whether snowmobiles fell under the statutory definition

of "motor vehicle" which included, in relevant part, "every self-propelled vehicle which

is designed for use upon a highway . . . ." *Id.*  To interpret this phrase, the court relied

upon the plain meaning of the word "designed" as defined in the dictionary—"to plan or

produce with special intentional adaptation to a specific end." *Id.*  Applying this

meaning, the court concluded that a snowmobile would not be covered under the statute

because snowmobiles are not "intended and adapted for the purpose of 'use upon a

19

highway.'"  *Id.*; *see also United Fin. Cas. Co. v. Nelson*, Civ. No. 14-816, 2015 WL

2373428, at *4 (D. Minn. May 18, 2015) (applying *Stepec*'s definition of "designed" to

conclude that a snowmobile is not "designed for travel on public roads"); *Kastning v.

State Farm Ins. Cos.*, 821 N.W.2d 621, 626-27 (Minn. App. 2012) (discussing *Stepec* and

applying its rationale to interpret the phrase "designed for use on public highways");

*United Ohio Ins. Co. v. Schaeffer*, 18 N.E.3d 863, 866 (Ohio Ct. App. 2014) ("The term

'designed' means the purpose for which the item was manufactured or 'devise[d] for a

specific function or end.'" (quoting Webster's Collegiate Dictionary 338 (2003))).

      "Recreational use" also has an ordinary meaning that this Court can apply to the

Gator.  The ordinary meaning of the word "recreational" is "of, relating to, or

characteristic of recreation."  Merriam-Webster's Collegiate Dictionary 1040 (11th ed.

2006).  In turn, "recreation" means "refreshment of strength and spirits after work" or "a

means of refreshment or diversion:  hobby."  *Id.* (capitalization omitted).  "[A]ccording to

both plain, ordinary sense and what a reasonable person in the position of the insured

would have understood the words to mean," *Wolters*, 831 N.W.2d at 636 (quotation

marks omitted), the Court concludes that "recreational use" refers to activities of leisure

or diversion, as opposed to work purposes.

      Thus, applying *Stepec*'s plain meaning interpretation of the word "designed" and

the ordinary meaning of the word "recreational," the Court must determine whether the

Gator was principally produced with special intentional adaptation for leisure or

diversion off public roads.  The Court concludes that the undisputed facts establish that it

was not.  The Gator Operator's Manual produced by John Deere offers persuasive

evidence of the purpose for which the Gator was produced or intended. *See, e.g.*, *Concord Gen. Mut. Ins. Co. v. Delong*, No. 2004-137, 2004 WL 5581629 (Vt. Sept. Term 2004) (relying on the manual of a John Deere lawn and garden tractor to determine that the tractor was not designed for recreation). The Gator Operator's Manual explicitly states that the Gator "is a utility vehicle, not a recreation vehicle." (Gator Operator's Manual at 3.) Warnings within the manual caution users against "[h]orseplay or recreational riding." (*Id.* at 4.) In fact, the manual states clearly that "[t]he utility vehicle is not designed for recreational riding." (*Id.* at 5.) Finally, the manual suggests that the Gator is intended for work purposes, stating that riders should "[w]ear close fitting clothing and safety equipment *appropriate for the job*." (*Id.* at 8 (emphasis added).) These statements within the manufacturer's own manual indicate strongly that the Gator was not produced with the intention of being used for leisure or diversion.

In addition to the persuasive evidence within the Gator's manual, promotional materials for John Deere's 2015 Gator models also indicate the principal purpose for which the Gator was designed. Morgan Creek's Gator is a TH 6x4 model within the Traditional series of Gator Utility Vehicles. The TH 6x4 is described as "[a] true workhorse" (Brotten Aff. II ¶ 4, Ex. 2), and the Traditional series vehicles are advertised as "worksite-ready" with a "backbone to get the job done whether in a barb-wired pasture or a construction site." (Hearn Dep., Ex. 2 at 2.) Traditional series Gators are further described as "Hardworking, Reliable Utility Vehicles" useful for "your farm, home or jobsite." (Brotten Aff. II ¶ 4, Ex. 2.) Much like the Gator Operator's Manual, these

promotional materials do not support a conclusion that the Gator model owned by

Morgan Creek was principally designed for recreational use.

Finally, although the informal tour around the winery on the day of the accident

may be deemed a recreational use, the Court does not find this use to be relevant for the

Court's inquiry.  Given the clear warning labels on the Gator itself indicating that the

cargo box is not intended for passengers, the purported recreational use of the vehicle to

transport a large group of people does not appear to be the Gator's principally intended

use.[6]  Further, the winery purchased the Gator from a machinery company that also sells

farm equipment such as tractors and lawn mowers.  P. Marti and A. Marti testified that

the Gator was primarily used at the winery for agricultural purposes and that they were

never aware of it being used for recreational purposes.  B. Marti and West Bend offer no

evidence to dispute this testimony, and the Court is not persuaded that the Gator's misuse

on the day of the accident creates a genuine fact dispute as to the Gator's principal

design.

Third, under Minnesota law, the Court concludes that the Gator does not fall under

the statutory definition of "recreational motor vehicle."  In *Christie*, the Minnesota Court

of Appeals applied the statutory definition of "recreational motor vehicles" in Minn. Stat.

§ 84.90, subd. 1 (1996), to interpret very similar language to the language at issue in the

Metropolitan Policy.  580 N.W.2d at 508-09.  All of the parties also urge the Court to

---

[6]     And in fact, on the day of the accident, the Gator was initially used for transporting food and supplies and was later intended to be used for picking up firewood. These uses correlate with the non-recreational nature of the Gator as a utility vehicle useful for carrying cargo.

consider this statute in analyzing the Metropolitan Policy.  This statute, contained in the chapter of Minnesota Statutes governing the Department of Natural Resources, defines "recreational motor vehicle" as "any self-propelled vehicle and any vehicle propelled or drawn by a self-propelled vehicle used for recreational purposes, including but not limited to snowmobile, trail bike or other all-terrain vehicle, hovercraft, or motor vehicle licensed for highway operation which is being used for off-road recreational purposes." Minn. Stat. § 84.90, subd. 1.  The parties do not appear to dispute that the Gator qualifies as an all-terrain vehicle under Minnesota statutes.  However, the parties dispute whether the Gator was "used for recreational purposes" as provided in Minn. Stat. § 84.90, subd. 1.

Although the statute includes "all-terrain vehicle[s]" within the list of examples of recreational motor vehicles, the statutory text limits the definition of "recreational motor vehicle" to only those vehicles that are "used for recreational purposes."[7]  As discussed above, the Court concludes that the Gator was not "used for recreational purposes," notwithstanding its use at the winery on the day of the accident.  Because Minn. Stat. § 84.90, subd. 1, limits the definition of "recreational motor vehicle" to those that are

---

[7]     In *Christie*, 580 N.W.2d 507, the Minnesota Court of Appeals concluded that snowmobiles were "designed for recreational use off public roads" because snowmobiles were included within the definition of "recreational motor vehicles" in Minn. Stat. § 84.90, subd. 1.  *Id.* at 509.  The court did not specifically discuss whether the snowmobile in question was "used for recreational purposes" and declined to consider other possible purposes for which snowmobiles can be designed such as hauling or transportation.  *Id.*  Here, the Court finds the "used for recreational purposes" portion of the statute to be conclusive because the Gator was not used for recreational purposes, despite its misuse on the day of the accident.

"used for recreational purposes," this statutory definition further supports the Court's

conclusion that the Gator was not "principally designed for recreational use off public

roads."

The unambiguous plain language of the recreational use exception to the

motorized vehicle exclusion limits the exception's application to vehicles that are

principally produced with special intentional adaptation for leisure or diversion off public

roads.  The undisputed evidence establishes that John Deere did not principally produce

the Gator for purposes of leisure or diversion.  The winery's actual use of the Gator and

Minnesota statutes further support this conclusion.  Therefore, the Court concludes that

the Gator was not "principally designed for recreational use off public roads."

### 2. "Not Subject to Motor Vehicle Registration"

The Metropolitan Policy's recreational use exception to the motorized vehicle

exclusion applies to extend coverage only if all four elements of the exception are

established.  Because the Court concludes that the Gator was not "principally designed

for recreational use off public roads," the Court need not address whether the Gator meets

element (4)—that the Gator was "not subject to motor vehicle registration."

Because B. Marti and West Bend have failed to establish a necessary element for

this exception to apply, the Court concludes that the Metropolitan Policy provides no

coverage to Hearn for B. Marti's claimed damages sustained in the September 22, 2012

accident.  Metropolitan has no duty to defend or indemnify Hearn for any liability he

faces in the underlying lawsuit.

24

### III.     Coverage Under the West Bend Policy

The West Bend Policy provides coverage for amounts "the insured" is legally

obligated to pay as a result of bodily injury.  (Nelson Decl. ¶ 3, Ex. B. at WB000019.)

Under the section designating "who is an insured," the policy identifies the following

individuals who are eligible for coverage:  the partnership or joint venture, its members,

its partners, and their spouses (with respect to the conduct of the business).  (*Id.* at

WB00027.)  Also designated as "an insured" are "volunteer workers" and "employees"

("while performing duties related to the conduct of [the] business" or "for acts within the

scope of their employment").  (*Id.*)

Metropolitan contends that the West Bend Policy provides coverage because

Hearn was an agent of Morgan Creek under Minnesota's motor-vehicle vicarious liability

statute at the time of the accident.  Thus, Metropolitan asserts, Hearn is an insured under

the West Bend Policy.

West Bend and Morgan Creek dispute this argument, arguing that Hearn cannot be

an insured under the policy because he does not fit into any of the categories in the policy

identifying who is an insured, and he is not deemed an insured even if he is deemed

Morgan Creek's agent.  B. Marti admits that Hearn is not an insured under the West Bend

Policy.

The Court concludes that the West Bend Policy does not provide coverage to

Hearn because he is not an "insured" under the plain language of the policy.  In *North*

*Star Mutual Insurance Co. v. Carlson*, 442 N.W.2d 848, 853 (Minn. Ct. App. 1989), the

Minnesota Court of Appeals considered whether three individuals would be covered

under the homeowners insurance policy of a relative who lived on adjoining property. The court engaged in a "close reading" of the relevant policy to conclude that the three relatives were not entitled to coverage. *Id.* The policy in question defined an "insured" as "you . . . and . . . residents of your household; [and] . . . any person engaged in your employment." *Id.* at 851. The court reasoned that the three relatives were not covered because they neither resided in the insured's household nor qualified as employees of the insured. *Id.* at 853. The court went on to explain that "[e]ven assuming [one of the relatives] was her agent, the policy includes as insureds only employees and not agents. . . . [W]e know of no authority requiring an insurer to defend and indemnify an insured's agent unless such an obligation appears in the insurance policy itself." *Id.* Here, as in *Carlson*, the policy does not include agents within the categories of listed "insureds." Thus, even if Hearn is ultimately deemed Morgan Creek's agent for liability purposes, he is not an insured under the West Bend Policy, and West Bend has no duty to defend or indemnify him in the underlying lawsuit.

## III.   Priority of Coverage

Because the Court finds that neither policy provides any coverage to Hearn for the accident and the potential liability he faces in the underlying lawsuit, the Court does not need to address Metropolitan's priority of coverage claim. Therefore, the Court denies as moot the motions for summary judgment with respect to the priority of coverage issue.

## ORDER

Based on the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant Barbara Marti's Motion for Summary Judgment (Doc. No. [35]) is **DENIED**.  To the extent Barbara Marti's summary judgment motion seeks a declaration of coverage under the West Bend Policy to cover Morgan Creek's liability, that portion of the summary judgment motion is **DENIED AS MOOT**.  The parties do not dispute that West Bend is obligated to cover Morgan Creek's liability if such liability is established in the underlying lawsuit.

2.     Plaintiff's Motion for Summary Judgment (Doc. No. [44]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     The Court grants summary judgment in favor of Plaintiff with respect to the Metropolitan Policy.  The Metropolitan Policy issued to Hearn provides no coverage for any claims asserted by B. Marti against Hearn arising out of the September 22, 2012 accident because coverage is excluded under the motorized land vehicle exclusion, and the recreational use exception to this exclusion does not apply.  Plaintiff owes no duty to defend or indemnify Hearn in connection with the underlying lawsuit.

b.     The Court denies Plaintiff's summary judgment motion to the extent Plaintiff seeks a declaration with respect to the West Bend Policy. The West Bend Policy issued to Morgan Creek provides no coverage for any claims asserted by B. Marti against Hearn arising out of the September

27

22, 2012 accident because Hearn is not an "insured" under the terms of the

policy.  West Bend owes no duty to defend or indemnify Hearn in

connection with the underlying lawsuit.

        c.      The Court denies as moot summary judgment with respect to

Plaintiff's priority of coverage argument.

     3.      Defendant West Bend Mutual Insurance Company's Motion for Summary

Judgment (Doc. No. [50]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

        a.      The Court grants summary judgment in favor of West Bend

with respect to the West Bend Policy for the reasons stated above.  West

Bend owes no duty to defend or indemnify Hearn in connection with the

underlying lawsuit.

        b.      The Court denies West Bend's summary judgment motion

with respect to the Metropolitan Policy for the reasons stated above.

Plaintiff owes no duty to defend or indemnify Hearn in connection with the

underlying lawsuit.

     **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:  February 5, 2016               s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       United States District Judge